## LAWTON et al. v. DARGAN.

### In re HARTSVILLE WOOD MFG. CO.

(Circuit Court of Appeals, Fourth Circuit. December 6, 1916.)

No. 1455.

NOVATION ☞10—CLAIMS—RELEASE.

Where the holders of all the stock of a corporation, who also held notes given by it for large amounts, sold the stock to the manager of the business and surrendered the notes in consideration of the manager's agreement to pay the agreed price out of the proceeds of the business and to pledge the stock as security for such payments, the former stockholders could not, after the bankruptcy of the corporation in a year, assert claims against the estate on the theory that they retained their claims against the corporation and that the manager's agreement was that the corporation would pay those claims to the extent and in the manner agreed.

[Ed. Note.—For other cases, see Novation, Cent. Dig. § 10; Dec. Dig. ☞10.]

Appeal from the District Court of the United States for the Eastern District of South Carolina, at Charleston, in Bankruptcy; Henry A. M. Smith, Judge.

In the matter of Hartsville Wood Manufacturing Company, bankrupt. From an order of the District Court disallowing the claim of J. J. Lawton and another as trustees against the estate of which B. D. Dargan was trustee, the claimants appeal. Affirmed.

F. L. Willcox, of Florence, S. C., and E. O. Woods, of Darlington, S. C. (Willcox & Willcox and S. M. Wetmore, all of Florence, S. C., on the brief), for appellants.

George E. Dargan, of Darlington, S. C., for appellee.

Before PRITCHARD and KNAPP, Circuit Judges, and ROSE, District Judge.

ROSE, District Judge. The appellants seek the allowance of a claim against the bankrupt estate. They will be called the "claimants"; the appellee, the "trustee"; the Hartsville Wood Manufacturing Company, the "bankrupt." The last-named is a South Carolina corporation organized in 1903, in which year it began business. It never thrived. Its six stockholders kept it afloat by lending it money with

which to pay what it owed others. For their advances they took its promissory notes. By 1909 these aggregated nearly $54,000. They then made up their minds to stop sending good money after bad and to get back as much as they could of that which they had lent it. The claimants, two of their own number, were selected by them to act as trustees for all. In some informal way the claimants were put in charge of the bankrupt and of its property. It made a deed of its real estate, plant, and machinery to them. These were sold for something under $15,000, and the proceeds were divided among the stockholders. The bankrupt's merchandise and accounts and bills receivable remained. The claimants wanted to turn them into money. One Leon W. Coker had been bankrupt's manager. He thought that its losses had been incurred in manufacturing. Its shutting down threw him out of employment. He was without means of his own. He hoped that, if on easy terms as to payment he could buy its goods and accounts, he could make a living by continuing the merchandising branch of its business, especially if he could do so in its name and with its credit. As its debts to outsiders had always been paid, it had a fair standing in the mercantile world. The claimants did not want to sacrifice its merchandise at a forced sale. They were unwilling to undertake the troublesome and unprofitable task of collecting the accounts of a concern which had gone out of business. Coker, who will be called the "buyer," knew more about its goods and its customers than any one else did. He and the claimants struck a bargain. He was to get all that was still in bankrupt's name. He was to give for it the figure at which it stood on bankrupt's books. He, of course, could not pay for it in cash, or in any other way except as and when he could get the money to do so out of it or out of the profits which his skill and energy enabled him to make from it. The most that he could promise to do was to pay small sums at frequent intervals. Accordingly, he bound himself to give the claimants $350 a month until the purchase price of $13,700, with interest at 7 per cent., was fully paid.

How was he to get title to that which he had bought? That was everything the bankrupt could then sell, its merchandise, the accounts due it, its good will, name, and aught else belonging to it. There was one, and perhaps only one, simple, easy, natural, and certain way of transferring it all to him. If he bought its capital stock, he would have all it could give. No inventories, schedules, notices to debtors or to creditors would be needed. All its capital stock was accordingly assigned to him or to his order. The transaction could not have taken this form if the stockholders had retained their claims against the bankrupt. He would not have agreed to pay $13,700 for the capital stock of a corporation which owed to one group of creditors at least $39,000, that is $54,000 less the $15,000 received or to be received from the proceeds of its real estate and whose net assets over and above its liabilities to persons outside the group referred to were not worth more than he was to pay. If he was to become the owner of that stock, the promissory notes held by its stockholders must first be cancelled. This was done. When one buys stock for which he does not pay in full, it is usual for him to indorse over the purchased certificates to the sellers

to be held by them as collateral security that the balance of the purchase price will be paid. In this case that was what was done.

In support of their contention that the balance of the $13,700 unpaid at the time of the bankruptcy was a debt of the bankrupt, each of the claimants testified, and they put the buyer on the stand. They make mystery and confusion out of a simple matter. The buyer testifies in one breath that he purchased the good will and personal property of the bankrupt, and the next that what he bought was its capital stock. The truth is he wanted the former. The surest way to obtain it was to buy the latter.

One may invest many millions in the purchase of a railroad. He seeks its franchises, its rights of way, its tracks, its buildings, its rolling stock, and the thousand and one other things it has. Its more or less well engraved certificates are in themselves well-nigh valueless, but it is nevertheless these certificates he buys. If he gets all of them outstanding, all the railroad's possessions are added unto them.

There was nothing done or written by the parties at the time the transaction was put through out of harmony with the view that the buyer purchased the capital stock of the bankrupt, except perhaps a phrase in the bond he gave for the price. In it he promised to keep the tangible property coming under his control insured for the protection of the claimants, and in that connection he refers to it as that which he had purchased from the Hartsville Wood Manufacturing Company. The court below was right in holding that this turn of expression is all too slender a foundation to support the contention that the buyer never bought the capital stock.

It is of little significance that he subsequently made such payments as he did make to claimants out of the bankrupt's assets and entered them upon its books. He was not likely to keep two sets of books, and less likely to distinguish closely between what belonged to him in his individual right and what was the property of a corporation all of whose stock he owned. Men of far greater knowledge of corporate affairs and of vastly greater experience in them often lose sight of that distinction.

At the time the bargain was struck between the buyer and the claimants, it seemed to be a good one for both of them. If he made his monthly payments for three years and four months, they would get out of what they sold the most they could hope in any way to realize from it. Even if he ceased to pay after a much shorter period, they might be as well off as they would have been had they auctioned off the merchandise and themselves attempted to collect the accounts. Unfortunately for them, the adjudication of the bankrupt followed in about a year after the buyer came into control of it. As he had no outside resources, his ability to continue payments was gone. He still owed them about $9,800 for which they are now seeking to hold the bankrupt liable.

Some of the suggestions which have been put forward in support of their contentions require but a word. In this proceeding it would profit them naught to show that they had a claim against the buyer trading as the Hartsville Wood Manufacturing Company or against a de facto

corporation which was not the same as the de jure, but in some way had appropriated its name and had come into possession of a part of its property and business. The bankrupt adjudicated is the legally incorporated South Carolina corporation. We are not in this case concerned with claims against anybody or anything else. Indeed, the claimants in their proof of claim say it is against a corporation and that such corporation is the Hartsville Wood Manufacturing Company.

There is no other theory reconcilable with what was done at the time of the transfer to the buyer which will serve them any better. It is true that the bankrupt then owed them $39,000. They might then have said to the buyer we will give you all the stock of the bankrupt if you will take hold of its affairs and try to work out of it enough to pay us $13,700, to which amount we will reduce our claims against it, and we will further agree that so long as it pays us $350 a month we will not press for a more rapid extinguishment of even that diminished principal. They could have made the further condition that he should guarantee or indorse the bankrupt's obligation to pay this $13,700 in the named installments. They say if we had done so our rights as against bankrupt and buyer would have been what we say they are. It is perfectly natural for them, not only to argue that in substance they did these very things, but now to believe that they did.

The evidence as to what actually took place sufficiently establishes that what was done was to sell the buyer the stock and to take his personal obligation secured by the pledge of the stock itself for the price. There may have been reasons at that time apparently good for putting the transaction through in the form actually adopted. It may have been thought that a debt resting on the buyer who was not trading as an individual would far less seriously hamper his efforts to make the bankrupt's business a success, than if such debt remained a burden upon it. The claimants say that none of the general creditors of the bankrupt other than themselves knew anything of their agreement with the buyer or of the form in which it was consummated. They argue that, as no one in extending credit could have been influenced by what was done in these respects, there is nothing to estop them now from asserting that what was done was what they now think they always intended to do. They urge that to say they may not prove their claim against the bankrupt is to deprive them of their last opportunity to save a little of the money they have expended for the bankrupt's benefit. The sufficient answer is that, having given the transaction with the buyer a form which involved certain definite consequences, they would have the unquestionable right there to stand if they would. It follows that they cannot now elect to assume another position, when to permit them so to do would take money from the creditors of the bankrupt to give it to them. Moreover, the relations between a corporation and the individual or group of individuals who own all its stock are so intimate, their actual power over it so absolute, their ability to exercise that power in all sorts of informal ways so complete, that public policy requires that when they have given one form to some transaction between it and them they must not be permitted to say that what they apparently did was not what they intended to do when to allow them

so to say would work harm to third persons who have dealt with the corporation.

It follows that the court below properly held that the claimants were not creditors of the bankrupt, and its order disallowing their claim against it should be affirmed.

---

⊙⊸For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes